UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| LELAH JERGER, <br> JADE JERGER, and <br> J. J., <br> <br> Plaintiffs, <br> <br> v. <br> <br> SHANNON BLAIZE, and <br> ALISON GARRETT, <br> <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) No. 3:18-cv-00030-RLY-MPB <br> ) <br> ) <br> ) <br> ) <br> ) |

**ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

At stake in this civil rights lawsuit is whether Shannon Blaize and Allicyn Garrett (Defendants), two employees with Indiana's Department of Child Services (DCS), violated Lelah Jerger's, Jade Jerger's, and J.J.'s (Plaintiffs) constitutional rights when they told the Jergers they would open a Child in Need of Services (CHINS) proceeding unless the Jergers brought their daughter, J.J., to the hospital for medical treatment. The court finds Defendants are entitled to qualified immunity. Accordingly, Defendants' motion for summary judgment is **granted**, and Plaintiffs' motion for partial summary judgment is **denied as moot**.

**I.    Background**

The facts are either undisputed or presented in the light most favorable to Plaintiffs. *Stark v. Johnson & Johnson*, --- F.4th ----, No. 20-1837, 2021 WL 3732273, at *1 (7th Cir. Aug. 24, 2021). "Presented in the light most favorable to Plaintiffs" means

1

the court accepts their version of what happened; it does not mean the court vouches for the objective truth of the facts presented below.  *Id.*

The facts of this case are lengthy and detailed, so the court does its best to provide a summary of the key events without excluding out critical details.  (*See* Filing No. 74-3 at 11 – 14, DCS Preliminary Report of Child Abuse ("Preliminary Report"); Filing No. 79-4, DCS Assessment of Alleged Child Neglect ("Assessment"); Filing No. 81-3 at 13 – 26, DCS's Intake Officer's Report of Preliminary Inquiry and Investigation ("Intake Report")).  The facts are presented in five sections: (A) J.J.'s epilepsy and treatment; (B) DCS's initial involvement; (C) the blood draw at Norton Hospital; (D) the follow-up at Norton Hospital; and (E) the procedural history.

### A.     J.J.'s Epilepsy and Treatment

This case revolves around J.J.'s medical treatment and Lelah and Jade Jergers' parental rights.  J.J. is now five years old.  In July 2017, when J.J. was one year-old, doctors with Riley Children's Hospital ("Riley") in Indianapolis diagnosed J.J. with epilepsy.  A neurologist with Riley recommended J.J. start taking Keppra, a prescription medication designed to minimize the frequency of J.J.'s seizures.

Lelah and Jade did some initial research into Keppra and became concerned about its side effects.  In particular, they learned Keppra can cause extreme irritability.  Lelah then joined a Facebook group of parents who had similar concerns about Keppra.  Through the Facebook group, Lelah learned that many parents had success controlling their children's seizures with cannabidiol oil (CBD oil).  In August 2017, the Jergers saw

a chiropractic neurologist in Evansville, Indiana, and he put J.J. on CBD oil for her seizures.

This started the problems between the Jergers and J.J.'s treatment providers at Riley. During an appointment in August 2017, Riley's providers pressured the Jergers to place J.J. on Keppra instead of CBD Oil. The Jergers explained J.J. had fewer seizures since taking CBD oil, and given these results, they did not want to commit to placing J.J. on Keppra. On September 14, 2017, the Jergers took J.J. to Norton Hospital in Louisville, Kentucky for a second opinion. A neurologist with Norton explained he did not have a problem with J.J. taking CBD oil, but he also wanted J.J. to begin Keppra. The Jergers agreed, and J.J. began taking Keppra a few days later.

On September 20, 2017, Lelah talked to a nurse with Riley about scheduling an EEG (electroencephalography), which had been recommended by the neurologist at Norton. The nurse with Riley apparently never inquired into whether J.J. was taking Keppra. The nurse instead told Lelah she would call her back. Later that afternoon, the nurse called Lelah and told her it was time to get "Child Protective Services" involved. Lelah was extremely upset. She told the nurse the Jergers were firing Riley and would no longer take J.J. to Riley for care.

That same day, a social worker with Riley called DCS. She reported the Jergers were neglecting J.J. by not providing her Keppra. (Filing No. 74-3 at 11 – 14, DCS Preliminary Report of Child Abuse). The social worker relayed that Riley providers had counseled the Jergers about the risks of seizures on many different occasions (6/20, 7/20, 7/25, 8/2, 8/15), yet the Jergers were not providing J.J. with medication. The social

3

worker also reported—at their most recent appointment—Lelah had described a seizure episode J.J. had in early August. J.J. had turned blue and was unresponsive for fifteen seconds. The social worker was concerned that this was a "tonic-clonic seizure" which is serious and threatening. The social worker concluded the failure to take seizure medication could result in J.J.'s death.

### B. DCS's Initial Involvement

The report of neglect was assigned to Allicyn Garrett at DCS. The next day, on September 21, Garrett called a social worker at Riley to discuss the report. The social worker expressed her concerns that Lelah had not been giving J.J. the medication, which in her view constituted medical neglect. (*Id.* at 1).

Later that day, Garrett drove to the Jergers' house and talked to Lelah about J.J.'s treatment. (Assessment at 3). Lelah explained that J.J. had a history of seizures; that providers with Riley had recommended Keppra; and that they did not want to put J.J. on Keppra. (*Id.*). Despite those misgivings, Lelah told Garrett that she had filled the Keppra prescription on the 15th and had begun administering it on the 18th. (Intake Report at 1). Garrett found Lelah to be open and forthcoming, and she found the child appeared currently safe, with no safety concerns noted. (*Id.*).

Nonetheless, Garrett explained she need to talk to her supervisor, Defendant Shannon Blaize, so she went out to her car for thirty minutes. After a conversation with Blaize, Garrett returned to Lelah and explained she wanted the Jergers to sign a safety

4

plan[1] agreeing to provide certain treatments to J.J.  (*See* Filing No. 81-1 at 66, Safety Plan).  The safety plan states the Jergers will agree to do five tasks: (1) give Keppra as prescribed by J.J.'s doctors to J.J.; (2) take J.J. for bloodwork that same day to ensure the medication was in her system; (3) keep appointments at Norton; (4) take J.J. to get bloodwork done weekly throughout this assessment; and (5) give all medications as prescribed by the doctors to treat seizures.  (Safety Plan).  Lelah asked what would happen if she did not sign the document, and Garrett replied that DCS would file a motion to compel and J.J. would become a Child in Need of Services.  (Lelah Dep. at 40).  Garrett also told Lelah though the Jergers would be able to "make" their case at court, and that there would be a hearing and the Jergers could speak to the court.  (*Id.* at 41).  Lelah ultimately did not sign the safety plan, and Garrett left.

    **C.**    **The Blood Draw at Norton Hospital**

A couple hours later, Garrett called Lelah and explained that if the Jergers did not bring J.J. to Norton that evening, DCS would be filing a motion to compel and opening a CHINS proceeding.  (*Id.* at 42 – 25).  Lelah asked if she could speak to an attorney, but Garrett said they needed to do the draw that night to determine if Keppra was in J.J.'s system.  (*Id.*).  Lelah then told Garrett they would take J.J. in that night.  (*Id.*).

---

[1] Lelah says Garrett identified this document as an "informal adjustment".  (Filing No. 81-1 at 1, Deposition of Lelah Jerger at 37).  Garrett says she identified this document as a "safety plan".  (Filing No. 79-2, Deposition of Allicyn Garrett at 27).  The document itself is titled "Family Support / Community Services / Safety Plan".  (*See* Safety Plan).  Safety plans are agreements between the family and DCS that the family will take certain steps outlined in the plan.  (Garrett Dep. at 27).  DCS does these for every assessment.  (*Id.*).  In any event, this dispute is not material because there is no evidence that Lelah understood the legal difference between an informal adjustment or a safety plan, and there is no dispute that Lelah understood the contents of the safety plan—regardless of what it was called.

Because of a mix-up with doctor orders for the blood draw, it was not completed until the next evening, September 22. (*Id.* at 50 – 54). As the Jergers were walking into the hospital, Garrett told Lelah that a motion to compel had been filed, and a hearing would be the following Monday. (*Id.*). Lelah explains there were police officers there to escort them for J.J.'s blood draw. (*Id.*). Once the Jergers left the hospital, Garrett called Lelah and stated the hearing on Monday was cancelled. (*Id.*).

D.      **The Follow-Up at Norton Hospital**

Two days later, on the 24th, emergency services (EMS) responded to the Jergers home after Lelah complained J.J. was crying, vomiting, and choking. (Intake Report at 3). Lelah stated J.J. had started coughing and vomiting that morning, and that eventually she started choking. (*Id.*). Lelah told EMS that J.J. had epilepsy and that the vomiting was a side effect of that medications. (*Id.*). The Jergers refused care from EMS, stating they would take J.J. to Louisville for care. (*Id.*).

A lot happened two days later—September 26, 2021. Garrett spoke with Dr. Ryan Flamion, who was J.J.'s local primary care physician and who had referred the Jergers to Riley for treatment earlier that year. (*Id.*). Dr. Flamion said he never recommended CBD Oil and referred the Jergers to Riley to start J.J. on medication. (*Id.*). He fully agreed with Riley's decision to start J.J. on Keppra. (*Id.*).

That same day, J.J.'s blood draw results came back. (*Id.*). The results showed Keppra was in J.J.'s system, but it was a very low level. (*Id.*). The nurse practitioner who reviewed the results opined that the levels indicated the medication had only been started recently. (*Id.*).

Garrett then received a couple of calls from Norton. (*Id.* at 3 – 4). She first received a call, reporting what happened two days prior when the Jergers had called emergency services for J.J. She also received call from a clinical coordinator. (*Id.*). The clinical coordinator explained the senior attending physician was "insisting" that J.J. be seen immediately. (*Id.*). The clinical coordinator relayed that the physician wanted to conduct a comprehensive exam: a 23-hour EEG, several MRIs and additional testing to determine what medication is best for J.J. (*Id.*).

That same consultant then called Lelah to inform her of Norton's request for admission into the hospital. (*Id.*). Lelah became infuriated and had a "heated" conversation with the consultant. (Lelah Dep. at 58). The consultant explained to Lelah the attending physician wanted to do a comprehensive exam, but Lelah explained she first wanted to talk with her husband. (*Id.*).

Before Lelah could speak with her husband, Garret and Blaize called Lelah and told her she needed to take J.J. to Norton within three hours. (*Id.* at 59 – 63). Lelah inquired whether they could take J.J. to St. Vincent's hospital in Indianapolis, Indiana instead. (*Id.*). Blaize told her that if she did that, "things would look different." (*Id.*). Lelah interpreted this to be a threat that DCS would file a motion to compel or open a CHINS proceeding. (*Id.*). The Jergers brought J.J. to Norton for the comprehensive exam. (*Id.*).

The exam showed good results. The following day, while the 23-hour EEG was still taking place, the head of neurology at Norton visited the Jergers and explained J.J. was doing great. (*Id.* at 64 – 65). He declined to do an MRI; decided to take J.J. off all

7

pharmaceuticals; and increased the dosage for CBD oil. (Intake Report at 5). He recommended the family follow up with a nurse practitioner if J.J.'s condition worsened. (*Id.*).

### E. Procedural History

On February 5, 2018, the Jergers filed a complaint on their behalf and on J.J.'s behalf alleging both Garrett and Blaize violated their constitutional rights under the Fourth Amendment and the Fourteenth Amendment. Defendants moved to dismiss, which was denied on March 29, 2019. Defendants now have moved for summary judgment, arguing that they are entitled to qualified immunity. (Filing No. 77). The motion is fully briefed and ripe for ruling.[2]

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Pack v. Middlebury Com. Schools*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inference from it in the light most favorable to the nonmoving party.

---

[2] Plaintiffs have also moved for partial summary judgment. (Filing No. 74). But given the court's decision granting summary judgment to Defendants, Plaintiffs' motion is **denied** as moot.

*Khungar v. Access Community Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573 – 74 (7th Cir. 2017).

### III. Discussion

Plaintiffs argue Defendants violated J.J.'s rights under the Fourth Amendment by requiring J.J. to get her blood drawn. They also argue Defendants violated their parental and familial rights under the Fourteenth Amendment by requiring them to take J.J. for a blood draw, requiring them to give J.J. Keppra to control her seizures, and requiring them to seek care only at Norton Hospital. Defendants assert they are entitled to qualified immunity. The court discusses qualified immunity generally and then turns to Plaintiffs' specific claims.

#### A. Qualified Immunity

Qualified immunity shields government officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional law. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (citations omitted). In other words, qualified immunity protects government officials who act reasonably. *Id.* at 12 ("Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.") (internal quotations and citations omitted).

As in all qualified immunity cases, the court asks two questions: whether the government official has violated the plaintiff's rights, and if so, whether those rights were

clearly established at the time the conduct occurred. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citations omitted); *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021). Plaintiffs' claims fail both prongs.

### A. Defendants Did Not Violate Plaintiffs' Constitutional Rights

The Fourth Amendment protects citizens against "unreasonable searches and seizures." U.S. Const. amend. IV. This protection applies to blood draws. *See Herzog v. Village of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002). The Due Process clause prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. This guarantee includes a right to familial relations. *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 (7th Cir. 2000); *see also Sebesta v. Davis*, 878 F.3d 226, 229 (7th Cir. 2017) (recognizing a parent has a fundamental right to direct the upbringing of her children).

All agree that the court can analyze Plaintiffs' Fourth Amendment and Fourteenth Amendment claims together. *See Brokaw*, 235 F.3d at 1019 (describing the substantive due process analysis as "no different than that developed in the Fourth Amendment context"); *Wallis v. Spencer*, 202 F.3d 1126, 1137 n. 8 (9th Cir. 2000) ("As the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children, we analyze the [] claims together.").

When evaluating child protective services workers' actions, the court must weigh the parental interest in familial integrity against the state's interest in protecting children from harm. *Sebesta*, 878 F.3d at 233. "In order for their actions to be lawful, child protective service workers must have 'some definite and articulable evidence giving rise

10

to a reasonable suspicion that a child has been abused or is imminent danger of abuse.'" *Id.* (quoting *Brokaw*, 235 F.3d at 1019). The scope of the intrusion must also be reasonably necessary to prevent the specific injury. *Wallis*, 202 F.3d at 1138. This standard is an objective one. *Sebesta*, 878 F.3d at 233 (citing *Terry v. Richardson*, 346 F.3d 781, 787 (7th Cir. 2003)). Defendants have satisfied this standard with all three of Plaintiffs' claims.

*J.J.'s Blood Draw and Requirement to Take Keppra.* Defendants had reasonable suspicion to believe the Jergers were neglecting J.J. by not administering Keppra, and so they had lawful authority to threaten[3] filing a motion to compel and opening a CHINS proceeding.

It is undisputed that providers at both Norton and Riley prescribed and recommended J.J. be put on Keppra. A social worker with Riley reported that the Jergers were not providing J.J. with Keppra, and that failure to do so constituted medical neglect and could result in J.J.'s death. This same social worker relayed that Lelah had explained recently J.J. had a seizure episode where she turned blue and was unresponsive for fifteen minutes. When Garrett talked to Lelah, she corroborated much of what the social worker told DCS: that J.J. had a history of seizures, that J.J. recently had a serious episode; that J.J.'s providers recommended Keppra; and that the Jergers did not want to put J.J. on Keppra. Garrett also learned that Lelah joined a support group on Facebook and was exploring alternatives like CBD oil. While it is true that Lelah told Garrett that she had

---

[3] Again, this is disputed, but the court must construe the record in the light most favorable to the Jergers.

begun administering Keppra, the social worker had previously stated that the medication was at the Jerger's home but was *not administered*.

Given all this, it was reasonable to conclude J.J. was being neglected. *See* Ind. Code 31-34-1-1 (noting a child may be a Child in Need of Services if the child if the parent does not supply the child with necessary medical care). And so it was not unlawful for Defendants to threaten filing a motion to compel or opening CHINS proceeding. *Dupuy v. Samuels*, 465 F.3d 757, 762 (7th Cir. 2006) ("It is not a forbidden means of "coercing" a settlement to threaten merely to enforce one's legal rights.").

The Jergers resist this conclusion. They first argue, as a threshold legal matter, Defendants need more than reasonable suspicion. (Filing No. 81, Jergers' Brief at 15 – 17). But the court rejects this for a couple of reasons. First, Plaintiffs never really articulate what standard then actually applies. They suggest probable cause, but they proceed to analyze the claims under reasonable suspicion. (*Id.* at 22 – 32). Second, and more to the point, the reasonable suspicion standard is the proper standard in cases involving children and child protective services. *See Sebesta*, 878 F.3d at 233. That is the balance the Fourth Amendment strikes in these cases because children are different: the state has a strong interest in protecting children from harm. To be sure, the state must still use reasonable means necessary to prevent the specific injury. *Wallis*, 202 F.3d at 1138. But the court rejects Plaintiffs' arguments that "reasonable suspicion" does not govern here.

The Jergers next contend, as a factual matter, once Lelah told Garrett that she was administering the medication, that dispelled any suspicion that might have otherwise

12

existed. While Garrett was required to *consider* what Lelah said, she was not required to treat it as *dispositive*, *Sebesta*, 878 F.3d at 235, especially considering Riley's social worker flatly contradicted Lelah's account. It's clear that there was a disagreement between the Jergers and Riley's providers over J.J.'s treatment, and Garrett was caught in the middle. And given all the other evidence relayed by the social worker—much of which Lelah confirmed—Garrett did not act unreasonably by wanting to confirm J.J. was taking Keppra.

The Jergers insist that Garrett's threats to file a motion to compel and open a CHINS proceeding was no different than threating to remove J.J. from the Jergers. But the record does not support that conclusion. Garrett never threatened removing J.J. While she told Lelah that if Lelah did not sign the safety plan, DCS would file a motion to compel and J.J. would become a Child in Need of Service, (Lelah Dep at 40), she also explained this would be done at a hearing and Lelah would have the opportunity to speak and present her case to the court, (Lelah Dep at 41). That is close to the line; but the court does not think it crosses it. *See Dupuy,* 465 F.3d at 762. Accordingly, the court finds no constitutional violation with respect to J.J.'s blood draw or DCS's requirement to take Keppra.[4]

*Care at Norton Hospital.* Defendants also had reasonable suspicion to believe J.J. was in immediate danger and needed to be treated immediately, so Blaize had lawful

---

[4] There is another fundamental problem with Plaintiffs' claims that Defendants required the Jergers to give J.J. Keppra: the undisputed evidence shows the Jergers were giving J.J. Keppra *before* DCS was even involved in this case. (Intake Report at 1).

13

authority when she threatened "things would look different" when Lelah asked if they could go to a different provider rather than Norton.

The record shows a Norton clinical consultant called Defendants on the 26th and relayed that the doctor at Norton wanted J.J. admitted "immediately" to do a comprehensive exam. Garrett learned that same day that EMS responded to the Jergers house two days prior after J.J. was found crying, vomiting, and choking. (Intake Report at 4). Garrett also talked with J.J's primary care physician who said he agreed with Riley's providers that J.J. should be on Keppra. On top of that, Blaize likewise believed it was necessary to get J.J. to Norton immediately because "two reputable hospitals were concerned about J.J.'s well-being." (Filing No. 81-3, Deposition of Shannon Blaize at 37 – 38). Blaize also explained Norton told them it was an emergent situation. (*Id.*). Given all of this, Defendants had a reasonable belief that J.J. needed to be seen immediately.

The Jergers insist that just because DCS had reason to believe J.J. required immediate care does not necessarily mean that she needed immediate care *from Norton*— after all the Jergers offered to take J.J. to St. Vincent in Indianapolis. But Blaize explained that she did not actually believe the Jergers would take J.J. to St. Vincent. (Blaize Dep. at 39). And given the Jergers resistance to the medical providers at Riley and Norton, this belief was not unreasonable. Accordingly, Plaintiffs' claims that Defendants violated their rights by coercing them to go to Norton Hospital also fails.

  **B.**  **Plaintiffs' Rights were Not Clearly Established**

Even if Defendants violated Plaintiffs' constitutional rights, those rights were not clearly established at the time. A right is "clearly established" when it is "'sufficiently

14

clear that every reasonable official would have understood that what he or she is doing violates that right.'" *Mullenix*, 577 U.S. at 11 – 12 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). While there does not need to be a case "directly on point, [] existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. Plaintiff bears the burden of pointing to a case that is on point or at least closely analogous. *Sebesta*, 878 F.3d at 234.

Here, the Jergers have failed to identify such case. They cite cases for general propositions. (Filing No. 81, Jergers Brief at 32) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) and *Bumper v. North Carolina*, 391 U.S. 543 (1968) for proposition that submission to claim of "lawful authority" does not reflect consent); (*id.* at 32) (citing *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003) and *Michael C. v. Gresbach*, 526 F.3d 1008 (7th Cir. 2008) for the proposition that Fourth Amendment principles apply to child-welfare investigations); (*id.* at 34) (citing *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 (7th Cir. 2000), *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), and *Dupuy v. Samuels*, 465 F.3d 757, 762 (7th Cir. 2006) for the proposition that state actors need evidence supporting reasonable suspicion to report and investigate the parent); (*id.* at 35 n. 16) (citing five additional cases for the proposition that a search or seizure must end when reasonable suspicion dissipates, and child welfare officials must consider both inculpatory and exculpatory evidence). But the Supreme Court has "repeatedly told courts . . not to define clearly established law at a high level of generality." *Mullenix*, 577 U.S. at 12 (internal quotations and citation omitted). Instead, the inquiry "must be

undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (internal quotation and citations omitted).

What the Jergers needed to do here was point to a case that shows that "it would have been clear to [Blaize and Garrett] that the alleged conduct was unlawful in the situation they confronted." *Sebesta*, 878 F.3d at 235. They have not identified any case that is factually analogous to this one, and so Defendants are entitled to qualified immunity. *Sebesta*, 878 F.3d at 234 (noting it is often the case that child protective services cases fail to meet the specificity requirement of qualified immunity).

## IV. Conclusion

For those reasons, Defendants' motion for summary judgment (Filing No. 77) is **GRANTED**. Plaintiffs' motion for partial summary judgment is **DENIED as moot**. Final judgement shall enter accordingly.

**SO ORDERED** this 30th day of September 2021.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record